# EXHIBIT A

## 150th District Court

# Case Summary

### Case No. 2025CI12086

| | | | |
|---|---|---|---|
| **Samuel Pentowski VS Newrez LLC** | § | Location: | **150th District Court** |
| | § | Judicial Officer: | **150th, District Court** |
| | § | Filed on: | **05/29/2025** |

---

## Case Information

Case Type:   OTHER REAL PROPERTY

Case Status:   **05/29/2025**   **Pending**

---

## Assignment Information

**Current Case Assignment**

Case Number     2025CI12086
Court            150th District Court
Date Assigned    05/29/2025
Judicial Officer   150th, District Court

---

## Party Information

*Lead Attorneys*

| | | |
|---|---|---|
| **Plaintiff** | **Pentowski, Samuel** | **MINERVE, JAMES G** *Retained* |
| **Defendant** | **Newrez LLC** | |

---

## Events and Orders of the Court

05/29/2025     New Cases Filed (OCA)

05/29/2025　　PETITION

05/30/2025

TEMPORARY RESTRAINING ORDER (OCA)　　(Judicial Officer: Arteaga, Antonia)
　　*EX PARTE RESTRAINING ORDER, ORDER TO POST BOND, AND ORDER SETTING HEARING*
　　*FOR TEMPORARY*

05/30/2025　　LETTER TO DISTRICT CLERK
　　　　　*Requesting Copies*

06/02/2025　　CASH BOND
　　　　　*TRO BOND; $150.00 CASH DEPOSIT IN LIEU OF*

06/13/2025　　**MOTION TO SET NON JURY**　　(9:00 AM)
　　　　　*SETTING ON TEMPORARY EX PARTE RESTRANING ORDER, ORDER TO POST*
　　　　　*BOND, AND ORDER SETTING HEARING FOR TEMPORARY INJUNCTION &*
　　　　　*TEMP ORDERS-JM*

# EXHIBIT B

# EXHIBIT B-1

FILED
5/29/2025 1:49 PM
Gloria A. Martinez
Bexar County District Clerk
Accepted By: Mario Hernandez
Bexar County - 150th District Court

Case 5:25-cv-00663-FB    Document 1-1    Filed 06/12/25    Page 6 of 60

## 2025CI12086

CAUSE NO. _____

| | | |
|---|---|---|
| **SAMUEL PENTOWSKI,** | § | IN THE DISTRICT COURT OF |
| *Plaintiff*(s), | § | |
| | § | |
| v. | § | |
| | § | **BEXAR** COUNTY, TEXAS |
| **NEWREZ LLC D/B/A SHELLPOINT** | § | |
| **MORTGAGE SERVICING,** | § | |
| *Defendant(s),* | § | _____ JUDICIAL DISTRICT |

### PLAINTIFF'S ORIGINAL PETITION FOR DECLARATORY JUDGMENT AND APPLICATION FOR TE MPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

TO THE HONORABLE JUDGE OF THE COURT:

NOW COMES SAMUEL PENTOWSKI, the Plaintiff, complaining of Defendant, NEWREZ LLC D/B/A SHELLPOINT MORTGAGE SERVICING, and would show the Court the following:

### Discovery Control Plan

1. SAMUEL PENTOWSKI proposes that the discovery in this case be conducted under Discovery Control Plan Level 2. Tex. R. Civ. P. 190.3

### Parties

2. SAMUEL PENTOWSKI is a natural person whose homestead is in BEXAR County Texas.

3. Defendant, NEWREZ LLC D/B/A SHELLPOINT MORTGAGE SERVICING is a national banking company and may be served with process by and through its registered agent, Registered Agent Solutions, Inc., at 211 E. 7th St. Suite 620, Austin, Texas 78744.

### Venue and Jurisdiction

4. This Court has jurisdiction over the subject matter of this case, because the amount in controversy exceeds this Court's minimum jurisdictional requirements.

5. The Court has personal jurisdiction over the Defendant under Sec. 17.003 of the Texas Civil Practices and Remedies Code, because the real property, the subject of this lawsuit, is in Texas.

6. The venue in BEXAR County, Texas is proper in this cause under Section 15.011 of the Texas Civil Practice and Remedies Code because the real property, the subject of this lawsuit, is situated in BEXAR County, Texas.

Copy from re:SearchTX

## Brief Summary

7. The June 3, 2025, scheduled substitute trustee sale of the Property (the "Substitute Trustee Sale") is unlawful because the Plaintiff, through his attorney James Minerve, sent the Defendant a Qualified Written Request ("QWR"), pursuant to **RESPA, 12 USC §2605(e)**; however, the Defendant did not cancel the Substitute Trustee Sale until the loan servicer fully responds to the QWR as required under **12 C.F.R 1024.35(b)(9) and (10) and 1024.35(e)(3)(i)(B)**. Furthermore, the Defendant violated the **Dual Tracking Provisions of Regulation X (RESPA) 12 CFR 1024.41(g)**.

## Factual Background

**The Property**

8. The Plaintiff is the owner of the property located at 137 Harriett Drive, San Antonio, Texas 78216 ("Homestead" or "Property" or "real property"). The Plaintiff resides at this address, which is his homestead.

**Deed of Trust.**

9. February 14, 2022, The Plaintiff closed on a VA loan for $691,000.00, secured by a Deed of Trust (DOT). See Exhibit A

10. The original mortgagee is AmCap mortgage, Ltd. d/b/a Gold Financial Services.

11. The original trustee is Richard A. Ramirez.

12. NEWREZ LLC D/B/A SHELLPOINT MORTGAGE SERVICING is the current lender/mortgagee.

13. SHELLPOINT MORTGAGE SERVICING is the current loan servicer.

14. The attorneys of Mackie Wolf Zientz & Mann, P.C. are designated as the purported current trustee.

15. According to a recent Broker's Price Opinion, the value of the property is $700,00.00

16. The monthly mortgage is $5,244.04.

17. The Plaintiff believes he has some equity in the property.

18. Recently, the purported current trustee posted a Substitute Trustee Sale Notice in the BEXAR County Clerk's Office.

19. The Plaintiff has a buyer ready, willing, and able to enter a purchase contract that will close within 30 days and pay off the Defendant in full.

Copy from re:SearchTX

20. The Plaintiff has never applied for a TRO to stop a foreclosure.

**Qualified Written Request re: Notice of Error Prohibiting Foreclosure**

21. Friday, May 23, 2025, The Plaintiff through his attorney James Minerve, sent the Defendant a QWR pursuant to RESPA, 12 USC 2605(e). See Exhibit B and C

22. The QWR included a notice of error that 12 C.F.R. 1024.41(g) prohibited the loan servicer from foreclosing. See Exhibit D

23. Regulation X, 12 C.F.R. 1024.35(b)(9) and (10) and 1024.35(e)(3)(i)(B) prohibit a loan servicer from foreclosing on a borrower before fully responding to a QWR or correcting the errors pointed out in the QWR relating to12 C.F.R 1024.41(g). See Exhibit E

24. Neither the Defendant nor the Current Loan Servicer have responded to the Plaintiff's QWR. Therefore, June 3, 2025, scheduled Substitute Trustee Sale of the property is unlawful.

25. If the foreclosure is not postponed until the loan servicer responds to the QWR, the Plaintiff will suffer irreparable harm by losing title to his homestead and whatever equity he has in the Property.

**Loss Mitigation Application**

26. In January 2025, the Plaintiff submitted a completed loss mitigation application to the loan servicer. On that date the Plaintiff submitted all required completed loss mitigation forms, signed and dated, and submitted all required supporting documents, as specified on the loan servicer's Website.

27. To date none of the representatives of the loan servicer have sent the Plaintiff a rejection letter denying the loss mitigation application and explaining that the Plaintiff is ineligible for any loss mitigation relief, and the appeal process has been exhausted or is inapplicable, as required by 12 C.F.R 1024.41(g).

### Arguments

### Violation of Dual Tracking Provisions of Regulation X,

### 12 C.F.R 1024.35(b)(9) and (10) and 1024.35(e)(3)(i)(B) and 12 CFR 1024.41(g)

28. The Substitute Trustee Sale is unlawful because the Plaintiff sent the Defendant a QWR, pursuant to RESPA, 12 USC § 2605(e); however, the Defendant did not cancel the Substitute Trustee Sale until the loan servicer fully responds to the QWR as required under the statute and regulations.

29. As stated, Friday, May 23, 2025, the Plaintiff, through his attorney James Minerve, sent the Defendant a QWR pursuant to RESPA, 12 USC §2605(e).

30. The QWR included a notice of error that **12 C.F.R 1024.35(b)(9) and (10) and 1024.35(e)(3)(i)(B)**

Copy from re:SearchTX

and **12 CFR 1024.41(g)** prohibited the loan servicer from foreclosing until the loan servicer corrected the error and fully responded to the QWR.

31. Regulation X, **12 C.F.R 1024.35(b)(9) and (10) and 1024.35(e)(3)(i)(B)** prohibit a loan servicer from foreclosing on a borrower before fully responding to a QWR or correcting the errors pointed out in the QWR relating to **12 CFR 1024.41(g)**.

32. The loan servicer has not responded to the Plaintiff's QWR. Therefore, May 6, 2025, scheduled Substitute Trustee Sale of the property is unlawful.

33. Violation of RESPA, 12 USC § 2605(e) provides a private right of action for borrowers of federally related loans. *Henok v. Chase Home Finance, LLC*, 915 F.Supp.2d 109 *(D.D.C.*2013) (stating, "Mortgagor's allegation that he sent letters to mortgagee and its foreclosure agent requesting cure amount before the foreclosure on his property and that mortgagee and its agent failed to respond to the letters stated a claim against mortgagee under RESPA for failure to respond to borrower inquires, where mortgagor attached two letters addressed to mortgagee and agent which included name of mortgagor, address of property, and directly requested amount to cure his default.").

34. Upon receipt of a valid QWR including a notice of error relating to **12 CFR 1024.41(g), 12 C.F.R 1024.35(b)(9) and (10) and 1024.35(e)(3)(i)(B)** require a mortgagee and loan servicer to stop the foreclosure process. *Stroman v. Bank of America Corp.*, 852 F.Supp.2d 1366, (N.D.Ga. 2012) (stating, "Mortgagor stated a claim for violation of RESPA, by alleging that loan servicers failed to timely and properly acknowledge and respond to his qualified written requests (QWRs), some of which he attached to his complaint as an exhibit, failed to take corrective action identified in the QWRs, failed to provide his information requested in the QWRs, failed to cease their collection efforts after receiving the QWRs, and provided erroneous information to credit bureaus related to alleged overdue payments disputed in his QWRs, which damaged his credit score and reduced his access to credit.").

35. As stated above, the DOT is a federally related purchase money loan subject to federal regulations (See Exhibit A, DOT, page 16, Section 10).

36. The damages the Plaintiff must plead under RESPA is met by including allegations in this petition that allege the Plaintiff will suffer irreparable harm unless the foreclosure sale is postponed. *Agustin v. PNC Financial Services Group, Inc.*, 707 F.Supp.2d 1080 (D. Hawaii, 2010) (stating, "Allegations that borrowers sent written requests to lender for information relating to home

Copy from re:SearchTX

refinancing loans, and that lender failed to take action with respect to these requests, causing them actual damages, were sufficient to state a claim under Real Estate Settlement Procedures Act (RESPA), even though borrowers did not plead pecuniary damages.").

## Conditions Precedent

37. Pursuant to Rule 54 of the Texas Rules of Civil Procedure, all conditions precedent have been performed or have occurred.

## Request for Temporary Restraining Order

38. Plaintiff requests the Court to dispense with the issuance of a bond, and Plaintiff requests that the Defendant be temporarily restrained, without hearing, and upon notice and hearing be temporarily enjoined, pending further order of this Court, from foreclosing on the Deed of Trust.

39. If a temporary restraining order is not issued today, the Defendant will sell the Plaintiff's homestead and the Plaintiff will be irreparably harmed as stated in the attached affidavit.

40. The Plaintiff is likely to succeed on the merits because, as stated above, the Plaintiff sent Defendant a QWR, pursuant to RESPA, 12 USC § 2605(e); however, the Defendant did not cancel the Substitute Trustee Sale until fully responding to the QWR as required under the statute and regulations.

41. Granting the temporary restraining order is in the public interest, because enforcing contracts and discouraging foreclosures are in the public interest.

42. The Defendant may simply foreclose in 30 days, or recoup whatever expenses incurred by not foreclosing on the Plaintiff, which is permitted by the Deed of Trust; therefore, the potential harm to the Defendant is outweighed by the potential irreparable harm to the Plaintiff.

## Request for Temporary Order

43. Plaintiff requests that the Court, after notice and a hearing, without the necessity of a bond and to make temporary orders and issue any appropriate temporary injunctions deemed necessary and equitable by the Court.

## Attorney's Fees

44. Under Section 37.009, Tex Civ. Prac. & Rem Code, SAMUEL PENTOWSKI requests that the Court award them costs and reasonable and necessary attorneys' fees as equitable and just against the Defendant.

Copy from re:SearchTX

## Prayer

WHEREFORE, PREMISES CONSIDERED, the Plaintiff SAMUEL PENTOWSKI prays for the following:

45. Prayer for Declaratory Relief

46. WHEREFORE Plaintiff prays that after notice and hearing the Court declares the Substitute Trustee Sale of the Property is unlawful and must be postponed until: (a) the loan servicer or the Defendant fully responds to the Plaintiff's QWR; and (b) the loan servicer or the Defendant provides Plaintiff with a rejection letter as required by the dual tracking provisions of Regulation X.

47. Prayer for Relief

WHEREFORE Plaintiff prays that the Court immediately grant a temporary restraining order restraining Defendant, in conformity with the allegations of this Plaintiff, from the acts set forth above, and Plaintiff prays that, after notice and hearing, this temporary restraining order be made a temporary injunction.

1. Plaintiff prays that the Court, in addition to the temporary restraining orders and temporary injunction order prayed for above, after notice and hearing, grant a temporary injunction enjoining Defendant, in conformity with the allegations of this Petition from the acts set forth above while this case is pending, and enter temporary orders as requested above.

2. Plaintiff prays for expenses, costs and interest as allowed by law.

3. Plaintiff prays for general relief.

Respectfully submitted,
/s/ James Minerve

James Minerve
State Bar No. 24008692
13276 N HWY 183, Ste. 209
Austin, Texas 78750
(888) 819-1440 (Office)
(210) 336-5867 (Mobile)
(888) 230-6397 (Fax)
jgm@minervelaw.com
Attorney for Plaintiff
SAMUEL PENTOWSKI

Copy from re:SearchTX

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was sent to the following in accordance with the Texas Rules of Civil Procedure on this 29th day of May 2025:

Registered Agent Solutions, Inc., registered agent for
NEWREZ LLC D/B/A SHELLPOINT MORTGAGE SERVICING
211 E. 7th St. Suite 620
Austin, Texas 78744

/s/ James Minerve

James Minerve

Copy from re:SearchTX

Doc# 20220040750 02/17/2022 8:33AM Page 1 of 13 Lucy Adame-Clark, Bexar County Clerk



Exhibit

A

GF#

**Succession Title Company**

When recorded, mail to:
Amcap Mortgage Ltd C/O DocProbe
1126 Ocean Avenue
LAKEWOOD , NJ 08701

This document was prepared by:
Richard A. Ramirez
C&R Docs
8920 Business Park Drive, Suite 175
Austin, TX 78759
832-520-1030

Title Order No.: 21-2123-SAT

LOAN # ▮▮▮▮▮▮

—————————— [Space Above This Line For Recording Data] ——————————     CASE #: ▮▮▮▮▮▮

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## DEED OF TRUST

MIN ▮▮▮▮▮▮▮▮▮
MERS PHONE #: 1-888-679-6377

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.
(A) "Security Instrument" means this document, which is dated **February 11, 2022,**     together with all Riders to this document.
(B) "Borrower" is  SAMUEL PENTOWSKI  AND JAMES HARRISON, A MARRIED COUPLE.

Borrower is the grantor under this Security Instrument.
(C) "Lender" is  AmCap Mortgage, Ltd. DBA Gold Financial Services.

Lender is  a Limited Partnership,
under the laws of  Texas.     organized and existing
Lender's address is  9999 Bellaire Boulevard, Suite 700, Houston, TX 77036

Lender includes any holder of the Note who is entitled to receive payments under the Note.
(D) "Trustee" is  Richard A. Ramirez.

TEXAS – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3044 1/01   (rev. 10/17)
ICE Mortgage Technology, Inc.     Page 1 of 10     TXEDEED   1117
TXEDEED (CLS)
02/11/2022 11:57 AM PST



Copy from re:SearchTX

Trustee's address is  **8920 Business Park Drive, Suite 175, Austin, TX 78759.**

LOAN #  ███████

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated    **February 11, 2022.**    The Note states that Borrower owes Lender  **SIX HUNDRED NINETY ONE THOUSAND AND NO/100** * * * * * * * * * * * * * * * * * * * * * * * * * * * *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *  Dollars (U.S.  **$691,000.00**                     )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **March 1, 2052.**

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ Biweekly Payment Rider ☒ V.A. Rider
☐ Other(s) [specify]

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the  **County**                           [Type of Recording Jurisdiction]

of **BEXAR**
 [Name of Recording Jurisdiction]:

**Lot 20, in Block 8, NEW CITY BLOCK 10065, EAST SHEARER HILLS, are subdivision in Bexar County, Texas, according to the map or plat thereof recorded in Volume 4080, Page 242, of the Deed and Plat Records of Bexar County, Texas.**
**APN #: 100550080200**

which currently has the address of  **137 HARRIETT DRIVE, SAN ANTONIO,**                                                              [Street] [City]

**Texas 78216**                  ("Property Address"):
         [Zip Code]

**TEXAS – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**  Form 3044 1/01   (rev. 10/17)
ICE Mortgage Technology, Inc.                                    Page 2 of 10                                                    TXEDEED  1117
                                                                                                                                 TXEDEED (CLS)
                                                                                                                                 02/11/2022 11:57 AM PST



Copy from re:SearchTX

LOAN #

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property;and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.
2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.
3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall

TEXAS – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3044 1/01   (rev. 10/17)
ICE Mortgage Technology, Inc.                          Page 3 of 10

TXEDEED   1117
TXEDEED (CLS)
02/11/2022 11:57 AM PST

Copy from re:SearchTX

LOAN #

apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of



TXEDEED    1117
TXEDEED (CLS)
02/11/2022 11:57 AM PST

Copy from re:SearchTX

LOAN # ████████

the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument) or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the

TEXAS – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3044 1/01   (rev. 10/17)
ICE Mortgage Technology, Inc.                                    Page 5 of 10



TXEDEED   1117
TXEDEED (CLS)
02/11/2022 11:57 AM PST

Copy from re:SearchTX

Doc# 20220040750 02/17/2022 8:33AM Page 6 of 13 Lucy Adame-Clark, Bexar County Clerk

LOAN #:

insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then:

TEXAS – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT  Form 3044 1/01  (rev. 10/17)
ICE Mortgage Technology, Inc.  Page 6 of 10



TXEDEED  1117
TXEDEED (CLS)
02/11/2022 11:57 AM PST

Copy from re:SearchTX

LOAN #

(a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17.** Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that

TEXAS -- Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3044 1/01   (rev. 10/17)
ICE Mortgage Technology, Inc.
Page 7 of 10

TXEDEED   1117
TXEDEED (CLS)
02/11/2022 11:57 AM PST

Copy from re:SearchTX

LOAN #

time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. For the purposes of this Section 22, the term "Lender" includes any holder of the Note who is entitled to receive payments under the Note.

If Lender invokes the power of sale, Lender, its designee or Trustee shall give notice of the date, time, place and terms of sale by posting and filing the notice as provided by Applicable Law. Lender or its designee shall mail a copy of the notice to Borrower in the manner prescribed by Applicable Law. Sale shall be public, occurring between the hours of 10 a.m. and 4 p.m. on a date and at a location permitted by Applicable Law. The time of sale must begin at the time stated in the notice of sale or not later than three hours after the stated time. Borrower authorizes Trustee to sell the Property to the highest bidder for cash in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying indefeasible title to the Property with covenants of general warranty from Borrower. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

If the Property is sold pursuant to this Section 22, Borrower or any person holding possession of the Property through Borrower shall immediately surrender possession of the Property to the purchaser at that sale. If possession is not surrendered, Borrower or such person shall be a tenant at sufferance and may be removed by writ of possession or other court proceeding.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall provide a release of this Security Instrument to Borrower or Borrower's designated agent in accordance with Applicable Law. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee; Trustee Liability.** All rights, remedies and duties of Trustee under this Security Instrument may be exercised or performed by one or more trustees acting alone or together. Lender, at its option and with or without cause, may from time to time, by power of attorney or otherwise, remove or substitute any trustee, add one or more trustees, or appoint a successor trustee to any Trustee without the necessity of any formality other than a designation by Lender in writing. Without any further act or conveyance of the Property the substitute, additional or successor trustee shall become vested with the title, rights, remedies, powers and duties conferred upon Trustee herein and by Applicable Law.

Trustee shall not be liable if acting upon any notice, request, consent, demand, statement or other document believed by Trustee to be correct. Trustee shall not be liable for any act or omission unless such act or omission is willful.

**25. Subrogation.** Any of the proceeds of the Note used to take up outstanding liens against all or any part of the Property have been advanced by Lender at Borrower's request and upon Borrower's representation that such amounts are due and are secured by valid liens against the Property. Lender shall be subrogated to any and all rights, superior titles, liens and equities owned or claimed by any owner or holder of any outstanding liens and debts, regardless of whether said liens or debts are acquired by Lender by assignment or are released by the holder thereof upon payment.

**26. Partial Invalidity.** In the event any portion of the sums intended to be secured by this Security Instrument cannot be lawfully secured hereby, payments in reduction of such sums shall be applied first to those portions not secured hereby.



TXEDEED   1117
TXEDEED (CLS)
02/11/2022 11:57 AM PST

Copy from re:SearchTX

LOAN #

**27. Purchase Money; Owelty of Partition; Renewal and Extension of Liens Against Homestead Property; Acknowledgment of Cash Advanced Against Non-Homestead Property. Check box as applicable:**

[x] **Purchase Money.**

The funds advanced to Borrower under the Note were used to pay all or part of the purchase price of the Property. The Note also is primarily secured by the vendor's lien retained in the deed of even date with this Security Instrument conveying the Property to Borrower, which vendor's lien has been assigned to Lender, this Security Instrument being additional security for such vendor's lien.

[ ] **Owelty of Partition.**

The Note represents funds advanced by Lender at the special instance and request of Borrower for the purpose of acquiring the entire fee simple title to the Property and the existence of an owelty of partition imposed against the entirety of the Property by a court order or by a written agreement of the parties to the partition to secure the payment of the Note is expressly acknowledged, confessed and granted.

[ ] **Renewal and Extension of Liens Against Homestead Property.**

The Note is in renewal and extension, but not in extinguishment, of the indebtedness described on the attached Renewal and Extension Exhibit which is incorporated by reference. Lender is expressly subrogated to all rights, liens and remedies securing the original holder of a note evidencing Borrower's indebtedness and the original liens securing the indebtedness are renewed and extended to the date of maturity of the Note in renewal and extension of the indebtedness.

[ ] **Acknowledgment of Cash Advanced Against Non-Homestead Property.**

The Note represents funds advanced to Borrower on this day at Borrower's request and Borrower acknowledges receipt of such funds. Borrower states that Borrower does not now and does not intend ever to reside on, use in any manner, or claim the Property secured by this Security Instrument as a business or residential homestead. Borrower disclaims all homestead rights, interests and exemptions related to the Property.

**28. Loan Not a Home Equity Loan.** The Loan evidenced by the Note is not an extension of credit as defined by Section 50(a)(6) or Section 50(a)(7), Article XVI, of the Texas Constitution. If the Property is used as Borrower's residence, then Borrower agrees that Borrower will receive no cash from the Loan evidenced by the Note and that any advances not necessary to purchase the Property, extinguish an owelty lien, complete construction, or renew and extend a prior lien against the Property, will be used to reduce the balance evidenced by the Note or such Loan will be modified to evidence the correct Loan balance, at Lender's option. Borrower agrees to execute any documentation necessary to comply with this Section 28.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_Samuel Pentowski by James Harrison as Agent_ _____ (Seal)
**SAMUEL PENTOWSKI, BY JAMES HARRISON AS AGENT**

_James Harrison_ _____ (Seal)
**JAMES HARRISON**

TEXAS – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3044 1/01    (rev. 10/17)
ICE Mortgage Technology, Inc.                          Page 9 of 10

TXEDEED    1117
TXEDEED (CLS)
02/11/2022 11:57 AM PST



LOAN #: ▮▮▮▮▮▮▮

State of TEXAS

County of BEXAR

Before me, __Michelle Barrett__, on this day personally appeared SAMUEL PENTOWSKI, BY JAMES HARRISON AS AGENT AND JAMES HARRISON, known to me (or proved to me on the oath of _____ or through _____) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __14__ day of __Feb__, __22__

MICHELLE T BARRETT
Notary Public
State of Texas
ID # 13169677-0
My Comm. Expires 08-21-2022

_____
(Notary Public Signature)

Lender: AmCap Mortgage, Ltd. DBA Gold Financial Services
NMLS ID: 129122
Loan Originator: Christian Ruiz
NMLS ID: 1587545

TEXAS – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3044 1/01   (rev. 10/17)
ICE Mortgage Technology, Inc.                                           Page 10 of 10

TXEDEED   1117
TXEDEED (CLS)
02/11/2022 11:57 AM PST



Copy from re:SearchTX



LOAN #
CA
MIN:

## VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER

# NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.

THIS VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER is made this **11th** day of **February, 2022,** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Deed to Secure Debt (herein "Security Instrument") dated of even date herewith, given by the undersigned (herein "Borrower") to secure Borrower's Note to **AmCap Mortgage, Ltd. DBA Gold Financial Services**

(herein "Lender")
and covering the Property described in the Security Instrument and located at
**137 HARRIETT DRIVE
SAN ANTONIO, TX 78216**

VA GUARANTEED LOAN COVENANT: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

If the indebtedness secured hereby be guaranteed or insured under Title 38, United States Code, such Title and Regulations issued thereunder and in effect on the date hereof shall govern the rights, duties and liabilities of Borrower and Lender. Any provisions of the Security Instrument or other instruments executed in connection with said indebtedness which are inconsistent with said Title or Regulations, including, but not limited to, the provision for payment of any sum in connection with prepayment of the secured indebtedness and the provision that the Lender may accelerate payment of the secured indebtedness pursuant to Covenant 18 of the Security Instrument, are hereby amended or negated to the extent necessary to conform such instruments to said Title or Regulations.

LATE CHARGE: At Lender's option, and as allowed by applicable state law, Borrower will pay a "late charge" not exceeding four per centum (4%) of the overdue payment when paid more than fifteen (15) days after the due date thereof to cover the extra expense involved in handling delinquent payments, but such "late charge" shall not be payable out of the proceeds of any sale made to satisfy the indebtedness secured hereby, unless such proceeds are sufficient to discharge the entire indebtedness and all proper costs and expenses secured hereby.

GUARANTY: Should the Department of Veterans Affairs fail or refuse to issue its guaranty in full amount within 60 days from the date that this loan would normally become eligible for such guaranty committed upon by the Department of Veterans Affairs under the provisions of Title 38 of the U.S. Code "Veterans Benefits," the Mortgagee may declare the indebtedness hereby secured at once due and payable and may foreclose immediately or may exercise any other rights hereunder or take any other proper action as by law provided.

TRANSFER OF THE PROPERTY: This loan may be declared immediately due and payable upon transfer of the property securing such loan to any transferee, unless the acceptability of the assumption of the loan is established pursuant to Section 3714 of Chapter 37, Title 38, United States Code.

An authorized transfer ("assumption") of the property shall also be subject to additional covenants and agreements as set forth below:

(a) ASSUMPTION FUNDING FEE: A fee equal to one-half of 1 percent (.50%) of the balance of this loan as of the date of transfer of the property shall be payable at the time of transfer to the loan holder or its authorized agent, as trustee for the Department of Veterans

VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER
ICE Mortgage Technology, Inc.                    Page 1 of 2                    P8751ASR  0311
                                                                                P8751ASR (CLS)
                                                                       02/11/2022 11:57 AM PST



**LOAN #:** ▊

Affairs. If the assumer fails to pay this fee at the time of transfer, the fee shall constitute an additional debt to that already secured by this instrument, shall bear interest at the rate herein provided, and, at the option of the payee of the indebtedness hereby secured or any transferee thereof, shall be immediately due and payable. This fee is automatically waived if the assumer is exempt under the provisions of 38 U.S.C. 3729 (c).

(b) <u>ASSUMPTION PROCESSING CHARGE</u>: Upon application for approval to allow assumption of this loan, a processing fee may be charged by the loan holder or its authorized agent for determining the creditworthiness of the assumer and subsequently revising the holder's ownership records when an approved transfer is completed. The amount of this charge shall not exceed the maximum established by the Department of Veterans Affairs for a loan to which Section 3714 of Chapter 37, Title 38, United States Code applies.

(c) <u>ASSUMPTION INDEMNITY LIABILITY</u>: If this obligation is assumed, then the assumer hereby agrees to assume all of the obligations of the veteran under the terms of the instruments creating and securing the loan. The assumer further agrees to indemnify the Department of Veterans Affairs to the extent of any claim payment arising from the guaranty or insurance of the indebtedness created by this instrument.

IN WITNESS WHEREOF, Borrower(s) has executed this VA Guaranteed Loan and Assumption Policy Rider.

_Samuel Pentowski by James Harrison as Agent_ (Seal)
**SAMUEL PENTOWSKI, BY JAMES HARRISON AS AGENT**

_____ (Seal)
**JAMES HARRISON**

VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER
ICE Mortgage Technology, Inc.                    Page 2 of 2                    P8751ASR  0311
                                                                              P8751ASR (CLS)
                                                                              02/11/2022 11:57 AM PST



## GENERAL AFFIDAVIT

**State of Texas**　　　§
**County of Bexar**　　　§

**BEFORE ME**, the undersigned Notary, _Kimberly Rodriguez_ on this _27_ day of May 2025 personally appeared Samuel Pentowski, known to me to be a credible person of lawful age, who being by me duly sworn, on his oath, deposes and says:

1. I am of sound mind and capable of making this affidavit. I have personal knowledge of the facts stated below. I understand that I can be held criminally responsible if I lie in this statement. This statement is true.

2. The June 3, 2025, scheduled substitute trustee sale of the Property (the "Substitute Trustee Sale") is unlawful because I, through my attorney James Minerve, sent the Defendant a Qualified Written Request ("QWR"), pursuant to **RESPA, 12 USC §2605(e)**, however, the Defendant did not cancel the Substitute Trustee Sale until the loan servicer fully responds to the QWR as required under **12 C.F.R 1024.35(b)(9) and (10) and 1024.35(e)(3)(i)(B)**. Furthermore, the Defendant violated the **Dual Tracking Provisions of Regulation X (RESPA) 12 CFR 1024.41(g)**

3. I am the owner of the property located at 137 Harriett Drive, San Antonio, Texas 78216 ("Homestead" or "Property" or "real property"). I reside at this address, which is my homestead.

4. February 14, 2022, I closed on a VA loan for $691,000.00, secured by a Deed of Trust (DOT). See Exhibit A

5. The original mortgagee is AmCap mortgage, Ltd. d/b/a Gold Financial Services.

6. The original trustee is Richard A. Ramirez.

7. NEWREZ LLC D/B/A SHELLPOINT MORTGAGE SERVICING is the current lender/mortgagee.

8. SHELLPOINT MORTGAGE SERVICING is the current loan servicer.

9. The attorneys of Mackie Wolf Zientz & Mann, P.C. are designated as the purported current trustee.

10. According to a recent Broker's Price Opinion, the value of the property is $700,00.00

11. The monthly mortgage is $5,244.04

12. I believe I have some equity in the property.

13. Recently, the purported current trustee posted a Substitute Trustee Sale Notice in the BEXAR County Clerk's Office.

Page 1 of 2

Copy from re:SearchTX



## *12 USCS § 2605*

Current through Public Law 117-129, approved May 21, 2022.

*United States Code Service > TITLE 12. BANKS AND BANKING (Chs. 1 — 55) > CHAPTER 27. REAL ESTATE SETTLEMENT PROCEDURES (§§ 2601 — 2617)*

## § 2605. Servicing of mortgage loans and administration of escrow accounts

(a) **Disclosure to applicant relating to assignment, sale, or transfer of loan servicing.** Each person who makes a federally related mortgage loan shall disclose to each person who applies for the loan, at the time of application for the loan, whether the servicing of the loan may be assigned, sold, or transferred to any other person at any time while the loan is outstanding.

(b) **Notice by transferor of loan servicing at time of transfer.**

(1) Notice requirement. Each servicer of any federally related mortgage loan shall notify the borrower in writing of any assignment, sale, or transfer of the servicing of the loan to any other person.

(2) Time of notice.

(A) In general. Except as provided under subparagraphs (B) and (C), the notice required under paragraph (1) shall be made to the borrower not less than 15 days before the effective date of transfer of the servicing of the mortgage loan (with respect to which such notice is made).

(B) Exception for certain proceedings. The notice required under paragraph (1) shall be made to the borrower not more than 30 days after the effective date of assignment, sale, or transfer of the servicing of the mortgage loan (with respect to which such notice is made) in any case in which the assignment, sale, or transfer of the servicing of the mortgage loan is preceded by—

(i) termination of the contract for servicing the loan for cause;

(ii) commencement of proceedings for bankruptcy of the servicer; or

(iii) commencement of proceedings by the Federal Deposit Insurance Corporation or the Resolution Trust Corporation for conservatorship or receivership of the servicer (or an entity by which the servicer is owned or controlled).

(C) Exception for notice provided at closing. The provisions of subparagraphs (A) and (B) shall not apply to any assignment, sale, or transfer of the servicing of any mortgage loan if the person who makes the loan provides to the borrower, at settlement (with respect to the property for which the mortgage loan is made), written notice under paragraph (3) of such transfer.

(3) Contents of notice. The notice required under paragraph (1) shall include the following information:

(A) The effective date of transfer of the servicing described in such paragraph.

(B) The name, address, and toll-free or collect call telephone number of the transferee servicer.

(C) A toll-free or collect call telephone number for (i) an individual employed by the transferor servicer, or (ii) the department of the transferor servicer, that can be contacted by the borrower to answer inquiries relating to the transfer of servicing.

(D) The name and toll-free or collect call telephone number for (i) an individual employed by the transferee servicer, or (ii) the department of the transferee servicer, that can be contacted by the borrower to answer inquiries relating to the transfer of servicing.

James Minerve

Copy from re:SearchTX

12 USCS § 2605

**(E)** The date on which the transferor servicer who is servicing the mortgage loan before the assignment, sale, or transfer will cease to accept payments relating to the loan and the date on which the transferee servicer will begin to accept such payments.

**(F)** Any information concerning the effect the transfer may have, if any, on the terms of or the continued availability of mortgage life or disability insurance or an other type of optional insurance and what action, if any, the borrower must take to maintain coverage.

**(G)** A statement that the assignment, sale, or transfer of the servicing of the mortgage loan does not affect any term or condition of the security instruments other than terms directly related to the servicing of such loan.

**(c) Notice by transferee or loan servicing at time of transfer.**

**(1)** Notice requirement. Each transferee servicer to whom the servicing of an federally related mortgage loan is assigned, sold, or transferred shall notify the borrower of any such assignment, sale, or transfer.

**(2)** Time of notice.

**(A)** In general. Except as provided in subparagraphs (B) and (C), the notice required under paragraph (1) shall be made to the borrower not more than 15 days after the effective date of transfer of the servicing of the mortgage loan (with respect to which such notice is made).

**(B)** Exception for certain proceedings. The notice required under paragraph (1) shall be made to the borrower not more than 30 days after the effective date of assignment, sale, or transfer of the servicing of the mortgage loan (with respect to which such notice is made) in any case in which the assignment, sale, or transfer of the servicing of the mortgage loan is preceded by—

**(i)** termination of the contract for servicing the loan for cause;

**(ii)** commencement of proceedings for bankruptcy of the servicer; or

**(iii)** commencement of proceedings by the Federal Deposit Insurance Corporation or the Resolution Trust Corporation for conservatorship or receivership of the servicer (or an entity by which the servicer is owned or controlled).

**(C)** Exception for notice provided at closing. The provisions of subparagraphs (A) and (B) shall not apply to any assignment, sale, or transfer of the servicing of any mortgage loan if the person who makes the loan provides to the borrower, at settlement (with respect to the property for which the mortgage loan is made), written notice under paragraph (3) of such transfer.

**(3)** Contents of notice. Any notice required under paragraph (1) shall include the information described in subsection (b)(3).

**(d) Treatment of loan payments during transfer period.** During the 60-day period beginning on the effective date of transfer of the servicing of any federally related mortgage loan, a late fee may not be imposed on the borrower with respect to any payment on such loan and no such payment may be treated as late for any other purposes, if the payment is received by the transferor servicer (rather than the transferee servicer who should properly receive payment) before the due date applicable to such payment.

**(e) Duty of loan servicer to respond to borrower inquiries.**

**(1)** Notice of receipt of inquiry.

**(A)** In general. If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period.

James Minerve

Copy from re:SearchTX

12 USCS § 2605

**(B)** Qualified written request. For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—

**(i)** includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

**(ii)** includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

**(2)** Action with respect to inquiry. Not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall—

**(A)** make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

**(B)** after conducting an investigation, provide the borrower with a written explanation or clarification that includes—

**(i)** to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

**(ii)** the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

**(C)** after conducting an investigation, provide the borrower with a written explanation or clarification that includes—

**(i)** information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and

**(ii)** the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

**(3)** Protection of credit rating. During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency (as such term is defined under section 603 of the Fair Reporting Act [*15 USCS § 1681a*]).

**(4)** Limited extension of response time. The 30-day period described in paragraph (2) may be extended for not more than 15 days if, before the end of such 30-day period, the servicer notifies the borrower of the extension and the reasons for the delay in responding.

**(f) Damages and costs.** Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts:

**(1)** Individuals. In the case of any action by an individual, an amount equal to the sum of—

**(A)** any actual damages to the borrower as a result of the failure; and

**(B)** any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000.

**(2)** Class actions. In the case of a class action, an amount equal to the sum of—

**(A)** any actual damages to each of the borrowers in the class as a result of the failure; and

Copy from re:SearchTX

12 USCS § 2605

**(B)** any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not greater than $2,000 for each member of the class, except that the total amount of damages under this subparagraph in any class action may not exceed the lesser of—

   **(i)** $1,000,000; or

   **(ii)** 1 percent of the net worth of the servicer.

**(3)** Costs. In addition to the amounts under paragraph (1) or (2), in the case of any successful action under this section, the costs of the action, together with any attorneys fees incurred in connection with such action as the court may determine to be reasonable under the circumstances.

**(4)** Nonliability. A transferor or transferee servicer shall not be liable under this subsection for any failure to comply with any requirement under this section if, within 60 days after discovering an error (whether pursuant to a final written examination report or the servicer's own procedures) and before the commencement of an action under this subsection and the receipt of written notice of the error from the borrower, the servicer notifies the person concerned of the error and makes whatever adjustments are necessary in the appropriate account to ensure that the person will not be required to pay an amount in excess of any amount that the person otherwise would have paid.

**(g) Administration of escrow accounts.** If the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due. Any balance in any such account that is within the servicer's control at the time the loan is paid off shall be promptly returned to the borrower within 20 business days or credited to a similar account for a new mortgage loan to the borrower with the same lender.

**(h) Preemption of conflicting State laws.** Notwithstanding any provision of any law or regulation of any State, a person who makes a federally related mortgage loan or a servicer shall be considered to have complied with the provisions of any such State law or regulation requiring notice to a borrower at the time of application for a loan or transfer of the servicing of a loan if such person or servicer complies with the requirements under this section regarding timing, content, and procedures for notification of the borrower.

**(i) Definitions.** For purposes of this section:

**(1)** Effective date of transfer. The term "effective date of transfer" means the date on which the mortgage payment of a borrower is first due to the transferee servicer of a mortgage loan pursuant to the assignment, sale, or transfer of the servicing of the mortgage loan.

**(2)** Servicer. The term "servicer" means the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan). The term does not include—

**(A)** the Federal Deposit Insurance Corporation or the Resolution Trust Corporation, in connection with assets acquired, assigned, sold, or transferred pursuant to section 13(c) of the Federal Deposit Insurance Act [12 USCS § 1823(c)] or as receiver or conservator of an insured depository institution; and

**(B)** the Government National Mortgage Association, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Resolution Trust Corporation, or the Federal Deposit Insurance Corporation, in any case in which the assignment, sale, or transfer of the servicing of the mortgage loan is preceded by—

   **(i)** termination of the contract for servicing the loan for cause;

   **(ii)** commencement of proceedings for bankruptcy of the servicer; or

Copy from re:SearchTX

12 USCS § 2605

(iii) commencement of proceedings by the Federal Deposit Insurance Corporation or the Resolution Trust Corporation for conservatorship or receivership of the servicer (or an entity by which the servicer is owned or controlled).

(3) Servicing. The term "servicing" means receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in section 10 [*12 USCS § 2609*], and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

(j) Transition.

(1) Originator liability. A person who makes a federally related mortgage loan shall not be liable to a borrower because of a failure of such person to comply with subsection (a) with respect to an application for a loan made by the borrower before the regulations referred to in paragraph (3) take effect.

(2) Servicer liability. A servicer of a federally related mortgage loan shall not be liable to a borrower because of a failure of the servicer to perform any duty under subsection (b), (c), (d), or (e) that arises before the regulations referred to in paragraph (3) take effect.

(3) Regulations and effective date. The Bureau shall establish any requirements necessary to carry out this section. Such regulations shall include the model disclosure statement required under subsection (a)(2).

(k) Servicer prohibitions.

(1) In general. A servicer of a federally related mortgage shall not—

(A) obtain force-placed hazard insurance unless there is a reasonable basis to believe the borrower has failed to comply with the loan contract's requirements to maintain property insurance;

(B) charge fees for responding to valid qualified written requests (as defined in regulations which the Bureau of Consumer Financial Protection shall prescribe) under this section;

(C) fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties;

(D) fail to respond within 10 business days to a request from a borrower to provide the identity, address, and other relevant contact information about the owner or assignee of the loan; or

(E) fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this Act.

(2) Force-placed insurance defined. For purposes of this subsection and subsections (l) and (m), the term "force-placed insurance" means hazard insurance coverage obtained by a servicer of a federally related mortgage when the borrower has failed to maintain or renew hazard insurance on such property as required of the borrower under the terms of the mortgage.

(l) Requirements for force-placed insurance. A servicer of a federally related mortgage shall not be construed as having a reasonable basis for obtaining force-placed insurance unless the requirements of this subsection have been met.

(1) Written notices to borrower. A servicer may not impose any charge on any borrower for force-placed insurance with respect to any property securing a federally related mortgage unless—

(A) the servicer has sent, by first-class mail, a written notice to the borrower containing—

(i) a reminder of the borrower's obligation to maintain hazard insurance on the property securing the federally related mortgage;

James Minerve

Copy from re:SearchTX

12 USCS § 2605

**(ii)** a statement that the servicer does not have evidence of insurance coverage of such property;

**(iii)** a clear and conspicuous statement of the procedures by which the borrower may demonstrate that the borrower already has insurance coverage; and

**(iv)** a statement that the servicer may obtain such coverage at the borrower's expense if the borrower does not provide such demonstration of the borrower's existing coverage in a timely manner;

**(B)** the servicer has sent, by first-class mail, a second written notice, at least 30 days after the mailing of the notice under subparagraph (A) that contains all the information described in each clause of such subparagraph; and

**(C)** the servicer has not received from the borrower any demonstration of hazard insurance coverage for the property securing the mortgage by the end of the 15-day period beginning on the date the notice under subparagraph (B) was sent by the servicer.

**(2)** Sufficiency of demonstration. A servicer of a federally related mortgage shall accept any reasonable form of written confirmation from a borrower of existing insurance coverage, which shall include the existing insurance policy number along with the identity of, and contact information for, the insurance company or agent, or as otherwise required by the Bureau of Consumer Financial Protection.

**(3)** Termination of force-placed insurance. Within 15 days of the receipt by a servicer of confirmation of a borrower's existing insurance coverage, the servicer shall—

**(A)** terminate the force-placed insurance; and

**(B)** refund to the consumer all force-placed insurance premiums paid by the borrower during any period during which the borrower's insurance coverage and the force-placed insurance coverage were each in effect, and any related fees charged to the consumer's account with respect to the force-placed insurance during such period.

**(4)** Clarification with respect to Flood Disaster Protection Act. No provision of this section shall be construed as prohibiting a servicer from providing simultaneous or concurrent notice of a lack of flood insurance pursuant to section 102(e) of the Flood Disaster Protection Act of 1973 [*42 USCS § 4012a(e)*].

**(m) Limitations on force-placed insurance charges.**   All charges, apart from charges subject to State regulation as the business of insurance, related to force-placed insurance imposed on the borrower by or through the servicer shall be bona fide and reasonable.

## History

**HISTORY:**

Dec. 22, 1974, *P. L. 93-533*, § 6, as added Nov. 28, 1990, *P. L. 101-625*, Title IX, Subtitle C, § 941, *104 Stat. 4405*; April 10, 1991, *P. L. 102-27*, Title III, § 312, *105 Stat. 154*; Sept. 23, 1994, *P. L. 103-325*, Title III, § 345, *108 Stat. 2239*; Sept. 30, 1996, *P. L. 104-208*, Div A, Title II, Subtitle A, § 2103(a), *110 Stat. 3009*-399; July 21, 2010, *P. L. 111-203*, Title X, Subtitle H, § 1098(4), Title XIV, Subtitle E, § 1463, *124 Stat. 2104*, 2182.

Annotations

## Notes

Copy from re:SearchTX



## *12 CFR 1024.41*

This document is current through the October 28, 2019 issue of the Federal Register. Title 3 is current through August 30, 2019.

*Code of Federal Regulations > TITLE 12 -- BANKS AND BANKING > CHAPTER X--BUREAU OF CONSUMER FINANCIAL PROTECTION > PART 1024--REAL ESTATE SETTLEMENT PROCEDURES ACT (REGULATION X) > SUBPART C--MORTGAGE SERVICING*

## § 1024.41 Loss mitigation procedures.

**(a)**Enforcement and limitations. A borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (*12 U.S.C. 2605(f)*). Nothing in § 1024.41 imposes a duty on a servicer to provide any borrower with any specific loss mitigation option. Nothing in § 1024.41 should be construed to create a right for a borrower to enforce the terms of any agreement between a servicer and the owner or assignee of a mortgage loan, including with respect to the evaluation for, or offer of, any loss mitigation option or to eliminate any such right that may exist pursuant to applicable law.

**(b) Receipt of a loss mitigation application.**

**(1)**Complete loss mitigation application. A complete loss mitigation application means an application in connection with which a servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower. A servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application.

**(2)**Review of loss mitigation application submission. (i) Requirements. If a servicer receives a loss mitigation application 45 days or more before a foreclosure sale, a servicer shall:

**(A)**Promptly upon receipt of a loss mitigation application, review the loss mitigation application to determine if the loss mitigation application is complete; and

**(B)**Notify the borrower in writing within 5 days (excluding legal public holidays, Saturdays, and Sundays) after receiving the loss mitigation application that the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the loss mitigation application is either complete or incomplete. If a loss mitigation application is incomplete, the notice shall state the additional documents and information the borrower must submit to make the loss mitigation application complete and the applicable date pursuant to paragraph (b)(2)(ii) of this section. The notice to the borrower shall include a statement that the borrower should consider contacting servicers of any other mortgage loans secured by the same property to discuss available loss mitigation options.

**(ii)**Time period disclosure. The notice required pursuant to paragraph (b)(2)(i)(B) of this section must include a reasonable date by which the borrower should submit the documents and information necessary to make the loss mitigation application complete.

**(3)**Determining Protections. To the extent a determination of whether protections under this section apply to a borrower is made on the basis of the number of days between when a complete loss mitigation application is received and when a foreclosure sale occurs, such determination shall be made as of the date a complete loss mitigation application is received.

**(c)**Evaluation of loss mitigation applications.

James Minerve

Copy from re:SearchTX

12 CFR 1024.41

**(1)**Complete loss mitigation application. Except as provided in paragraph (c)(4)(ii) of this section, if a servicer receives a complete loss mitigation application more than 37 days before a foreclosure sale, then, within 30 days of receiving the complete loss mitigation application, a servicer shall:

**(i)**Evaluate the borrower for all loss mitigation options available to the borrower; and

**(ii)**Provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage. The servicer shall include in this notice the amount of time the borrower has to accept or reject an offer of a loss mitigation program as provided for in paragraph (e) of this section, if applicable, and a notification, if applicable, that the borrower has the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal, as provided for in paragraph (h) of this section.

**(2) Incomplete loss mitigation application evaluation.**

**(i)**In general. Except as set forth in paragraphs (c)(2)(ii) and (iii) of this section, a servicer shall not evade the requirement to evaluate a complete loss mitigation application for all loss mitigation options available to the borrower by offering a loss mitigation option based upon an evaluation of any information provided by a borrower in connection with an incomplete loss mitigation application.

**(ii)**Reasonable time. Notwithstanding paragraph (c)(2)(i) of this section, if a servicer has exercised reasonable diligence in obtaining documents and information to complete a loss mitigation application, but a loss mitigation application remains incomplete for a significant period of time under the circumstances without further progress by a borrower to make the loss mitigation application complete, a servicer may, in its discretion, evaluate an incomplete loss mitigation application and offer a borrower a loss mitigation option. Any such evaluation and offer is not subject to the requirements of this section and shall not constitute an evaluation of a single complete loss mitigation application for purposes of paragraph (i) of this section.

**(iii)**Short-term loss mitigation options. Notwithstanding paragraph (c)(2)(i) of this section, a servicer may offer a short-term payment forbearance program or a short-term repayment plan to a borrower based upon an evaluation of an incomplete loss mitigation application. Promptly after offering a payment forbearance program or a repayment plan under this paragraph (c)(2)(iii), unless the borrower has rejected the offer, the servicer must provide the borrower a written notice stating the specific payment terms and duration of the program or plan, that the servicer offered the program or plan based on an evaluation of an incomplete application, that other loss mitigation options may be available, and that the borrower has the option to submit a complete loss mitigation application to receive an evaluation for all loss mitigation options available to the borrower regardless of whether the borrower accepts the program or plan. A servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, and shall not move for foreclosure judgment or order of sale or conduct a foreclosure sale, if a borrower is performing pursuant to the terms of a payment forbearance program or repayment plan offered pursuant to this paragraph (c)(2)(iii). A servicer may offer a short-term payment forbearance program in conjunction with a short-term repayment plan pursuant to this paragraph (c)(2)(iii).

**(iv)**Facially complete application. A loss mitigation application shall be considered facially complete when a borrower submits all the missing documents and information as stated in the notice required under paragraph (b)(2)(i)(B) of this section, when no additional information is requested in such notice, or once the servicer is required to provide the borrower a written notice pursuant to paragraph (c)(3)(i) of this section. If the servicer later discovers that additional information or corrections to a previously submitted document are required to complete the application, the servicer must promptly request the missing information or corrected documents and treat the application as complete for the purposes of paragraphs (f)(2) and (g) of this section until the borrower is given a reasonable opportunity to complete the application. If the borrower completes the application within this period, the application shall be considered complete as of the date it first

James Minerve

Copy from re:SearchTX

12 CFR 1024.41

became facially complete, for the purposes of paragraphs (d), (e), (f)(2), (g), and (h) of this section, and as of the date the application was actually complete for the purposes of this paragraph (c). A servicer that complies with this paragraph (c)(2)(iv) will be deemed to have fulfilled its obligation to provide an accurate notice under paragraph (b)(2)(i)(B) of this section.

**(3)**Notice of complete application. (i) Except as provided in paragraph (c)(3)(ii) of this section, within 5 days (excluding legal public holidays, Saturdays, and Sundays) after receiving a borrower's complete loss mitigation application, a servicer shall provide the borrower a written notice that sets forth the following information:

**(A)**That the loss mitigation application is complete;

**(B)**The date the servicer received the complete application;

**(C)**That the servicer expects to complete its evaluation within 30 days of the date it received the complete application;

**(D)**That the borrower is entitled to certain foreclosure protections because the servicer has received the complete application, and, as applicable, either:

**(1)**If the servicer has not made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, that the servicer cannot make the first notice or filing required to commence or initiate the foreclosure process under applicable law before evaluating the borrower's complete application; or

**(2)**If the servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, that the servicer has begun the foreclosure process, and that the servicer cannot conduct a foreclosure sale before evaluating the borrower's complete application;

**(E)**That the servicer may need additional information at a later date to evaluate the application, in which case the servicer will request that information from the borrower and give the borrower a reasonable opportunity to submit it, the evaluation process may take longer, and the foreclosure protections could end if the servicer does not receive the information as requested; and

**(F)**That the borrower may be entitled to additional protections under State or Federal law.

**(ii)**A servicer is not required to provide a notice pursuant to paragraph (c)(3)(i) of this section if:

**(A)**The servicer has already provided the borrower a notice under paragraph (b)(2)(i)(B) of this section informing the borrower that the application is complete and the servicer has not subsequently requested additional information or a corrected version of a previously submitted document from the borrower pursuant to paragraph (c)(2)(iv) of this section;

**(B)**The application was not complete or facially complete more than 37 days before a foreclosure sale; or

**(C)**The servicer has already provided the borrower a notice regarding the application under paragraph (c)(1)(ii) of this section.

**(4)**Information not in the borrower's control --(i) Reasonable diligence. If a servicer requires documents or information not in the borrower's control to determine which loss mitigation options, if any, it will offer to the borrower, the servicer must exercise reasonable diligence in obtaining such documents or information.

**(ii)**Effect in case of delay. (A)(1) Except as provided in paragraph (c)(4)(ii)(A)(2) of this section, a servicer must not deny a complete loss mitigation application solely because the servicer lacks required documents or information not in the borrower's control.

**(2)**If a servicer has exercised reasonable diligence to obtain required documents or information from a party other than the borrower or the servicer, but the servicer has been unable to obtain such documents or information for a significant period of time following the 30-day period identified in paragraph (c)(1) of this section, and the servicer, in accordance with applicable requirements

James Minerve

Copy from re:SearchTX

## 12 CFR 1024.41

established by the owner or assignee of the borrower's mortgage loan, is unable to determine which loss mitigation options, if any, it will offer the borrower without such documents or information, the servicer may deny the application and provide the borrower with a written notice in accordance with paragraph (c)(1)(ii) of this section. When providing the written notice in accordance with paragraph (c)(1)(ii) of this section, the servicer must also provide the borrower with a copy of the written notice required by paragraph (c)(4)(ii)(B) of this section.

**(B)**If a servicer is unable to make a determination within the 30-day period identified in paragraph (c)(1) of this section as to which loss mitigation options, if any, it will offer to the borrower because the servicer lacks required documents or information from a party other than the borrower or the servicer, the servicer must, within such 30-day period or promptly thereafter, provide the borrower a written notice, informing the borrower:

**(1)**That the servicer has not received documents or information not in the borrower's control that the servicer requires to determine which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage;

**(2)**Of the specific documents or information that the servicer lacks;

**(3)**That the servicer has requested such documents or information; and

**(4)**That the servicer will complete its evaluation of the borrower for all available loss mitigation options promptly upon receiving the documents or information.

**(C)**If a servicer must provide a notice required by paragraph (c)(4)(ii)(B) of this section, the servicer must not provide the borrower a written notice pursuant to paragraph (c)(1)(ii) of this section until the servicer receives the required documents or information referenced in paragraph (c)(4)(ii)(B)(2) of this section, except as provided in paragraph (c)(4)(ii)(A)(2) of this section. Upon receiving such required documents or information, the servicer must promptly provide the borrower with the written notice pursuant to paragraph (c)(1)(ii) of this section.

**(d)**Denial of loan modification options. If a borrower's complete loss mitigation application is denied for any trial or permanent loan modification option available to the borrower pursuant to paragraph (c) of this section, a servicer shall state in the notice sent to the borrower pursuant to paragraph (c)(1)(ii) of this section the specific reason or reasons for the servicer's determination for each such trial or permanent loan modification option and, if applicable, that the borrower was not evaluated on other criteria.

**(e) Borrower response.**

**(1)**In general. Subject to paragraphs (e)(2)(ii) and (iii) of this section, if a complete loss mitigation application is received 90 days or more before a foreclosure sale, a servicer may require that a borrower accept or reject an offer of a loss mitigation option no earlier than 14 days after the servicer provides the offer of a loss mitigation option to the borrower. If a complete loss mitigation application is received less than 90 days before a foreclosure sale, but more than 37 days before a foreclosure sale, a servicer may require that a borrower accept or reject an offer of a loss mitigation option no earlier than 7 days after the servicer provides the offer of a loss mitigation option to the borrower.

**(2) Rejection.**

**(i)**In general. Except as set forth in paragraphs (e)(2)(ii) and (iii) of this section, a servicer may deem a borrower that has not accepted an offer of a loss mitigation option within the deadline established pursuant to paragraph (e)(1) of this section to have rejected the offer of a loss mitigation option.

**(ii)**Trial Loan Modification Plan. A borrower who does not satisfy the servicer's requirements for accepting a trial loan modification plan, but submits the payments that would be owed pursuant to any such plan within the deadline established pursuant to paragraph (e)(1) of this section, shall be provided a reasonable period of time to fulfill any remaining requirements of the servicer for

James Minerve

Copy from re:SearchTX

acceptance of the trial loan modification plan beyond the deadline established pursuant to paragraph (e)(1) of this section.

**(iii)**Interaction with appeal process. If a borrower makes an appeal pursuant to paragraph (h) of this section, the borrower's deadline for accepting a loss mitigation option offered pursuant to paragraph (c)(1)(ii) of this section shall be extended until 14 days after the servicer provides the notice required pursuant to paragraph (h)(4) of this section.

**(f)**Prohibition on foreclosure referral. (1) Pre-foreclosure review period. A servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless:

**(i)**A borrower's mortgage loan obligation is more than 120 days delinquent;

**(ii)**The foreclosure is based on a borrower's violation of a due-on-sale clause; or

**(iii)**The servicer is joining the foreclosure action of a superior or subordinate lienholder.

**(2)**Application received before foreclosure referral. If a borrower submits a complete loss mitigation application during the pre-foreclosure review period set forth in paragraph (f)(1) of this section or before a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, a servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless:

**(i)**The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;

**(ii)**The borrower rejects all loss mitigation options offered by the servicer; or

**(iii)**The borrower fails to perform under an agreement on a loss mitigation option.

**(g)**Prohibition on foreclosure sale. If a borrower submits a complete loss mitigation application after a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process but more than 37 days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, unless:

**(1)**The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;

**(2)**The borrower rejects all loss mitigation options offered by the servicer; or

**(3)**The borrower fails to perform under an agreement on a loss mitigation option.

**(h) Appeal process.**

**(1)**Appeal process required for loan modification denials. If a servicer receives a complete loss mitigation application 90 days or more before a foreclosure sale or during the period set forth in paragraph (f) of this section, a servicer shall permit a borrower to appeal the servicer's determination to deny a borrower's loss mitigation application for any trial or permanent loan modification program available to the borrower.

**(2)**Deadlines. A servicer shall permit a borrower to make an appeal within 14 days after the servicer provides the offer of a loss mitigation option to the borrower pursuant to paragraph (c)(1)(ii) of this section.

**(3)**Independent evaluation. An appeal shall be reviewed by different personnel than those responsible for evaluating the borrower's complete loss mitigation application.

**(4)**Appeal determination. Within 30 days of a borrower making an appeal, the servicer shall provide a notice to the borrower stating the servicer's determination of whether the servicer will offer the borrower

Copy from re:SearchTX

## 12 CFR 1024.41

a loss mitigation option based upon the appeal and, if applicable, how long the borrower has to accept or reject such an offer or a prior offer of a loss mitigation option. A servicer may require that a borrower accept or reject an offer of a loss mitigation option after an appeal no earlier than 14 days after the servicer provides the notice to a borrower. A servicer's determination under this paragraph is not subject to any further appeal.

**(i)**Duplicative requests. A servicer must comply with the requirements of this section for a borrower's loss mitigation application, unless the servicer has previously complied with the requirements of this section for a complete loss mitigation application submitted by the borrower and the borrower has been delinquent at all times since submitting the prior complete application.

**(j)**Small servicer requirements. A small servicer shall be subject to the prohibition on foreclosure referral in paragraph (f)(1) of this section. A small servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process and shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, if a borrower is performing pursuant to the terms of an agreement on a loss mitigation option.

**(k)**Servicing transfers --(1) In general --(i) Timing of compliance. Except as provided in paragraphs (k)(2) through (4) of this section, if a transferee servicer acquires the servicing of a mortgage loan for which a loss mitigation application is pending as of the transfer date, the transferee servicer must comply with the requirements of this section for that loss mitigation application within the timeframes that were applicable to the transferor servicer based on the date the transferor servicer received the loss mitigation application. All rights and protections under paragraphs (c) through (h) of this section to which a borrower was entitled before a transfer continue to apply notwithstanding the transfer.

**(ii)**Transfer date defined. For purposes of this paragraph (k), the transfer date is the date on which the transferee servicer will begin accepting payments relating to the mortgage loan, as disclosed on the notice of transfer of loan servicing pursuant to § 1024.33(b)(4)(iv).

**(2)**Acknowledgment notices --(i) Transferee servicer timeframes. If a transferee servicer acquires the servicing of a mortgage loan for which the period to provide the notice required by paragraph (b)(2)(i)(B) of this section has not expired as of the transfer date and the transferor servicer has not provided such notice, the transferee servicer must provide the notice within 10 days (excluding legal public holidays, Saturdays, and Sundays) of the transfer date.

**(ii)**Prohibitions. A transferee servicer that must provide the notice required by paragraph (b)(2)(i)(B) of this section under this paragraph (k)(2):

**(A)**Shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process until a date that is after the reasonable date disclosed to the borrower pursuant to paragraph (b)(2)(ii) of this section, notwithstanding paragraph (f)(1) of this section. For purposes of paragraph (f)(2) of this section, a borrower who submits a complete loss mitigation application on or before the reasonable date disclosed to the borrower pursuant to paragraph (b)(2)(ii) of this section shall be treated as having done so during the pre-foreclosure review period set forth in paragraph (f)(1) of this section.

**(B)**Shall comply with paragraphs (c), (d), and (g) of this section if the borrower submits a complete loss mitigation application to the transferee or transferor servicer 37 or fewer days before the foreclosure sale but on or before the reasonable date disclosed to the borrower pursuant to paragraph (b)(2)(ii) of this section.

**(3)**Complete loss mitigation applications pending at transfer. If a transferee servicer acquires the servicing of a mortgage loan for which a complete loss mitigation application is pending as of the transfer date, the transferee servicer must comply with the applicable requirements of paragraphs (c)(1) and (4) of this section within 30 days of the transfer date.

**(4)**Applications subject to appeal process. If a transferee servicer acquires the servicing of a mortgage loan for which an appeal of a transferor servicer's determination pursuant to paragraph (h) of this

James Minerve

Copy from re:SearchTX

### 12 CFR 1024.41

section has not been resolved by the transferor servicer as of the transfer date or is timely filed after the transfer date, the transferee servicer must make a determination on the appeal if it is able to do so or, if it is unable to do so, must treat the appeal as a pending complete loss mitigation application.

**(i)**Determining appeal. If a transferee servicer is required under this paragraph (k)(4) to make a determination on an appeal, the transferee servicer must complete the determination and provide the notice required by paragraph (h)(4) of this section within 30 days of the transfer date or 30 days of the date the borrower made the appeal, whichever is later.

**(ii)**Servicer unable to determine appeal. A transferee servicer that is required to treat a borrower's appeal as a pending complete loss mitigation application under this paragraph (k)(4) must comply with the requirements of this section for such application, including evaluating the borrower for all loss mitigation options available to the borrower from the transferee servicer. For purposes of paragraph (c) or (k)(3) of this section, as applicable, such a pending complete loss mitigation application shall be considered complete as of the date the appeal was received by the transferor servicer or the transferee servicer, whichever occurs first. For purposes of paragraphs (e) through (h) of this section, the transferee servicer must treat such a pending complete loss mitigation application as facially complete under paragraph (c)(2)(iv) as of the date it was first facially complete or complete, as applicable, with respect to the transferor servicer.

**(5)**Pending loss mitigation offers. A transfer does not affect a borrower's ability to accept or reject a loss mitigation option offered under paragraph (c) or (h) of this section. If a transferee servicer acquires the servicing of a mortgage loan for which the borrower's time period under paragraph (e) or (h) of this section for accepting or rejecting a loss mitigation option offered by the transferor servicer has not expired as of the transfer date, the transferee servicer must allow the borrower to accept or reject the offer during the unexpired balance of the applicable time period.

(Approved by the Office of Management and Budget under control number 3170-0027.)

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

*12 U.S.C. 2603–2605, 2607, 2609, 2617, 5512, 5532, 5581.*

## History

[*78 FR 10696, 10876*, Feb. 14, 2013; *78 FR 60382, 60437*, Oct. 1, 2013; *78 FR 69753*, Nov. 21, 2013; *81 FR 72160, 72373*, Oct. 19, 2016]

Annotations

## Notes

**[EFFECTIVE DATE NOTE:**

*78 FR 10696, 10876*, Feb. 14, 2013, added Subpart C, effective Jan. 10, 2014; *78 FR 60382, 60437*, Oct. 1, 2013, amended this section, effective Jan. 10, 2014; *81 FR 72160, 72373*, Oct. 19, 2016, amended this section, effective Oct. 19, 2017.]

## Case Notes

James Minerve

Copy from re:SearchTX



## *12 CFR 1024.35*

This document is current through the May 31, 2022 issue of the Federal Register, with the exception of the amendments appearing at 87 FR 32320.

*Code of Federal Regulations > Title 12 Banks and Banking > Chapter X — Bureau of Consumer Financial Protection > Part 1024 — Real Estate Settlement Procedures Act (Regulation X) > Subpart C — Mortgage Servicing*

## § 1024.35 Error resolution procedures.

**(a)** Notice of error. A servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred. A notice on a payment coupon or other payment form supplied by the servicer need not be treated by the servicer as a notice of error. A qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error for purposes of this section, and a servicer must comply with all requirements applicable to a notice of error with respect to such qualified written request.

**(b)** Scope of error resolution. For purposes of this section, the term "error" refers to the following categories of covered errors:

    **(1)** Failure to accept a payment that conforms to the servicer's written requirements for the borrower to follow in making payments.

    **(2)** Failure to apply an accepted payment to principal, interest, escrow, or other charges under the terms of the mortgage loan and applicable law.

    **(3)** Failure to credit a payment to a borrower's mortgage loan account as of the date of receipt in violation of *12 CFR 1026.36(c)(1)*.

    **(4)** Failure to pay taxes, insurance premiums, or other charges, including charges that the borrower and servicer have voluntarily agreed that the servicer should collect and pay, in a timely manner as required by § 1024.34(a), or to refund an escrow account balance as required by § 1024.34(b).

    **(5)** Imposition of a fee or charge that the servicer lacks a reasonable basis to impose upon the borrower.

    **(6)** Failure to provide an accurate payoff balance amount upon a borrower's request in violation of section *12 CFR 1026.36(c)(3)*.

    **(7)** Failure to provide accurate information to a borrower regarding loss mitigation options and foreclosure, as required by § 1024.39.

    **(8)** Failure to transfer accurately and timely information relating to the servicing of a borrower's mortgage loan account to a transferee servicer.

    **(9)** Making the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process in violation of § 1024.41(f) or (j).

    **(10)** Moving for foreclosure judgment or order of sale, or conducting a foreclosure sale in violation of § 1024.41(g) or (j).

    **(11)** Any other error relating to the servicing of a borrower's mortgage loan.

**(c)** Contact information for borrowers to assert errors. A servicer may, by written notice provided to a borrower, establish an address that a borrower must use to submit a notice of error in accordance with the procedures in

James Minerve

12 CFR 1024.35

this section. The notice shall include a statement that the borrower must use the established address to assert an error. If a servicer designates a specific address for receiving notices of error, the servicer shall designate the same address for receiving information requests pursuant to § 1024.36(b). A servicer shall provide a written notice to a borrower before any change in the address used for receiving a notice of error. A servicer that designates an address for receipt of notices of error must post the designated address on any Web site maintained by the servicer if the Web site lists any contact address for the servicer.

**(d)** Acknowledgment of receipt. Within five days (excluding legal public holidays, Saturdays, and Sundays) of a servicer receiving a notice of error from a borrower, the servicer shall provide to the borrower a written response acknowledging receipt of the notice of error.

**(e)** Response to notice of error.

    **(1)** Investigation and response requirements

        **(i)** In general. Except as provided in paragraphs (f) and (g) of this section, a servicer must respond to a notice of error by either:

            **(A)** Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

            **(B)** Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

        **(ii)** Different or additional error. If during a reasonable investigation of a notice of error, a servicer concludes that errors occurred other than, or in addition to, the error or errors alleged by the borrower, the servicer shall correct all such additional errors and provide the borrower with a written notification that describes the errors the servicer identified, the action taken to correct the errors, the effective date of the correction, and contact information, including a telephone number, for further assistance.

    **(2)** Requesting information from borrower. A servicer may request supporting documentation from a borrower in connection with the investigation of an asserted error, but may not:

        **(i)** Require a borrower to provide such information as a condition of investigating an asserted error; or

        **(ii)** Determine that no error occurred because the borrower failed to provide any requested information without conducting a reasonable investigation pursuant to paragraph (e)(1)(i)(B) of this section.

    **(3)** Time limits

        **(i)** In general. A servicer must comply with the requirements of paragraph (e)(1) of this section:

            **(A)** Not later than seven days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the notice of error for errors asserted under paragraph (b)(6) of this section.

            **(B)** Prior to the date of a foreclosure sale or within 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the notice of error, whichever is earlier, for errors asserted under paragraphs (b)(9) and (10) of this section.

            **(C)** For all other asserted errors, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the applicable notice of error.

James Minerve

Copy from re:SearchTX

12 CFR 1024.35

**(ii)** Extension of time limit. For asserted errors governed by the time limit set forth in paragraph (e)(3)(i)(C) of this section, a servicer may extend the time period for responding by an additional 15 days (excluding legal public holidays, Saturdays, and Sundays) if, before the end of the 30-day period, the servicer notifies the borrower of the extension and the reasons for the extension in writing. A servicer may not extend the time period for responding to errors asserted under paragraph (b)(6), (9), or (10) of this section.

**(4)** Copies of documentation. A servicer shall provide to the borrower, at no charge, copies of documents and information relied upon by the servicer in making its determination that no error occurred within 15 days (excluding legal public holidays, Saturdays, and Sundays) of receiving the borrower's request for such documents. A servicer is not required to provide documents relied upon that constitute confidential, proprietary or privileged information. If a servicer withholds documents relied upon because it has determined that such documents constitute confidential, proprietary or privileged information, the servicer must notify the borrower of its determination in writing within 15 days (excluding legal public holidays, Saturdays, and Sundays) of receipt of the borrower's request for such documents.

**(5)** Omissions in responses to requests for documentation. In its response to a request for documentation under paragraph (e)(4) of this section, a servicer may omit location and contact information and personal financial information (other than information about the terms, status, and payment history of the mortgage loan) if:

**(i)** The information pertains to a potential or confirmed successor in interest who is not the requester; or

**(ii)** The requester is a confirmed successor in interest and the information pertains to any borrower who is not the requester.

**(f)** Alternative compliance.

**(1)** Early correction. A servicer is not required to comply with paragraphs (d) and (e) of this section if the servicer corrects the error or errors asserted by the borrower and notifies the borrower of that correction in writing within five days (excluding legal public holidays, Saturdays, and Sundays) of receiving the notice of error.

**(2)** Error asserted before foreclosure sale. A servicer is not required to comply with the requirements of paragraphs (d) and (e) of this section for errors asserted under paragraph (b)(9) or (10) of this section if the servicer receives the applicable notice of an error seven or fewer days before a foreclosure sale. For any such notice of error, a servicer shall make a good faith attempt to respond to the borrower, orally or in writing, and either correct the error or state the reason the servicer has determined that no error has occurred.

**(g)** Requirements not applicable.

**(1)** In general. A servicer is not required to comply with the requirements of paragraphs (d), (e), and (i) of this section if the servicer reasonably determines that any of the following apply:

**(i)** Duplicative notice of error. The asserted error is substantially the same as an error previously asserted by the borrower for which the servicer has previously complied with its obligation to respond pursuant to paragraphs (d) and (e) of this section, unless the borrower provides new and material information to support the asserted error. New and material information means information that was not reviewed by the servicer in connection with investigating a prior notice of the same error and is reasonably likely to change the servicer's prior determination about the error.

**(ii)** Overbroad notice of error. The notice of error is overbroad. A notice of error is overbroad if the servicer cannot reasonably determine from the notice of error the specific error that the borrower asserts has occurred on a borrower's account. To the extent a servicer can reasonably identify a valid assertion of an error in a notice of error that is otherwise overbroad, the servicer shall comply

Copy from re:SearchTX

12 CFR 1024.35

with the requirements of paragraphs (d), (e) and (i) of this section with respect to that asserted error.

**(iii)** Untimely notice of error. A notice of error is delivered to the servicer more than one year after:

**(A)** Servicing for the mortgage loan that is the subject of the asserted error was transferred from the servicer receiving the notice of error to a transferee servicer; or

**(B)** The mortgage loan is discharged.

**(2)** Notice to borrower. If a servicer determines that, pursuant to this paragraph (g), the servicer is not required to comply with the requirements of paragraphs (d), (e), and (i) of this section, the servicer shall notify the borrower of its determination in writing not later than five days (excluding legal public holidays, Saturdays, and Sundays) after making such determination. The notice to the borrower shall set forth the basis under paragraph (g)(1) of this section upon which the servicer has made such determination.

**(h)** Payment requirements prohibited. A servicer shall not charge a fee, or require a borrower to make any payment that may be owed on a borrower's account, as a condition of responding to a notice of error.

**(i)** Effect on servicer remedies.

**(1)** Adverse information. After receipt of a notice of error, a servicer may not, for 60 days, furnish adverse information to any consumer reporting agency regarding any payment that is the subject of the notice of error.

**(2)** Remedies permitted. Except as set forth in this section with respect to an assertion of error under paragraph (b)(9) or (10) of this section, nothing in this section shall limit or restrict a lender or servicer from pursuing any remedy it has under applicable law, including initiating foreclosure or proceeding with a foreclosure sale.

(Approved by the Office of Management and Budget under control number 3170-0027.)

## Statutory Authority

*Authority Note Applicable to 12 CFR Ch. X, Pt. 1024*

## History

[*78 FR 10696*, 10876, Feb. 14, 2013; *78 FR 60382*, 60437, Oct. 1, 2013; *78 FR 69753*, Nov. 21, 2013; *81 FR 72160*, 72371, Oct. 19, 2016]

Annotations

## Notes

**[EFFECTIVE DATE NOTE:**

*78 FR 10696* , 10876, Feb. 14, 2013, added Subpart C, effective Jan. 10, 2014; *78 FR 60382* , 60437, Oct. 1, 2013, revised paragraph (g)(1)(iii)(B), effective Jan. 10, 2014; *81 FR 72160* , 72371, Oct. 19, 2016, added paragraph (e)(5), effective Apr. 19, 2018.]

**Notes to Decisions**

James Minerve

Copy from re:SearchTX

## GENERAL AFFIDAVIT

State of Texas        §
County of Bexar     §

BEFORE ME, the undersigned Notary, _Kimberly Rodriguez_ on this _27_ day of May 2025 personally appeared Samuel Pentowski, known to me to be a credible person of lawful age, who being by me duly sworn, on his oath, deposes and says:

1. I am of sound mind and capable of making this affidavit. I have personal knowledge of the facts stated below. I understand that I can be held criminally responsible if I lie in this statement. This statement is true.

2. The June 3, 2025, scheduled substitute trustee sale of the Property (the "Substitute Trustee Sale") is unlawful because I, through my attorney James Minerve, sent the Defendant a Qualified Written Request ("QWR"), pursuant to **RESPA, 12 USC §2605(e)**; however, the Defendant did not cancel the Substitute Trustee Sale until the loan servicer fully responds to the QWR as required under **12 C.F.R 1024.35(b)(9) and (10) and 1024.35(e)(3)(i)(B)**. Furthermore, the Defendant violated the **Dual Tracking Provisions of Regulation X (RESPA) 12 CFR 1024.41(g)**.

3. I am the owner of the property located at 137 Harriett Drive, San Antonio, Texas 78216 ("Homestead" or "Property" or "real property"). I reside at this address, which is my homestead.

4. February 14, 2022, I closed on a VA loan for $691,000.00, secured by a Deed of Trust (DOT). See Exhibit A

5. The original mortgagee is AmCap mortgage, Ltd. d/b/a Gold Financial Services.

6. The original trustee is Richard A. Ramirez.

7. NEWREZ LLC D/B/A SHELLPOINT MORTGAGE SERVICING is the current lender/mortgagee.

8. SHELLPOINT MORTGAGE SERVICING is the current loan servicer.

9. The attorneys of Mackie Wolf Zientz & Mann, P.C. are designated as the purported current trustee.

10. According to a recent Broker's Price Opinion, the value of the property is $700,00.00

11. The monthly mortgage is $5,244.04.

12. I believe I have some equity in the property.

13. Recently, the purported current trustee posted a Substitute Trustee Sale Notice in the BEXAR County Clerk's Office.

Page 1 of 2

Copy from re:SearchTX

GENERAL AFFIDAVIT continued

14. I have a buyer ready, willing, and able to enter a purchase contract that will close within 30 days and pay off the Defendant in full.

15. I have never applied for a TRO to stop a foreclosure.

16. Friday, May 23, 2025, I through my attorney James Minerve, sent the Defendant a QWR pursuant to RESPA, 12 USC 2605(e). See Exhibit B and C

17. The QWR included a notice of error that 12 C.F.R. 1024.41(g) prohibited the loan servicer from foreclosing. See Exhibit D

18. Regulation X, 12 C.F.R. 1024.35(b)(9) and (10) and 1024.35(e)(3)(i)(B) prohibit a loan servicer from foreclosing on a borrower before fully responding to a QWR or correcting the errors pointed out in the QWR relating to 12 C.F.R 1024.41(g). See Exhibit E

19. Neither the Defendant nor the Current Loan Servicer have responded to my QWR. Therefore, June 3, 2025, scheduled Substitute Trustee Sale of the property is unlawful.

20. If the foreclosure is not postponed until the loan servicer responds to the QWR, I will suffer irreparable harm by losing title to my homestead and whatever equity I have in the Property.

21. In January 2025, I submitted a completed loss mitigation application to the loan servicer. On that date I submitted all required completed loss mitigation forms, signed and dated, and submitted all required supporting documents, as specified on the loan servicer's Website.

22. To date none of the representatives of the loan servicer have sent me a rejection letter denying the loss mitigation application and explaining that I am ineligible for any loss mitigation relief, and the appeal process has been exhausted or is inapplicable, as required by 12 C.F.R 1024.41(g).

Samuel Pentowski
137 Harriett Drive,
San Antonio, Texas 78216

State of Texas     §
County of Bexar     §

Sworn to and subscribed before me on the 27 day of May 2025, by Samuel Pentowski.

Notary Public, State of Texas
My Commission Expires December 17, 2028

KIMBERLY RODRIGUEZ
My Notary ID # 135205258
Expires December 17, 2028

Page 2 of 2

Copy from re:SearchTX

GENERAL AFFIDAVIT continued

14. I have a buyer ready, willing, and able to enter a purchase contract that will close within 30 days and pay off the Defendant in full.

15. I have never applied for a TRO to stop a foreclosure.

16. Friday, May 23, 2025, I through my attorney James Minerve, sent the Defendant a QWR pursuant to RESPA, 12 USC 2605(e). See Exhibit B and C

17. The QWR included a notice of error that 12 C.F.R. 1024.41(g) prohibited the loan servicer from foreclosing. See Exhibit D

18. Regulation X, 12 C.F.R. 1024.35(b)(9) and (10) and 1024.35(e)(3)(i)(B) prohibit a loan servicer from foreclosing on a borrower before fully responding to a QWR or correcting the errors pointed out in the QWR relating to12 C.F.R 1024.41(g). See Exhibit E

19. Neither the Defendant nor the Current Loan Servicer have responded to my QWR. Therefore, June 3, 2025, scheduled Substitute Trustee Sale of the property is unlawful

20. If the foreclosure is not postponed until the loan servicer responds to the QWR, I will suffer irreparable harm by losing title to my homestead and whatever equity I have in the Property.

21. In January 2025, I submitted a completed loss mitigation application to the loan servicer. On that date I submitted all required completed loss mitigation forms, signed and dated, and submitted all required supporting documents, as specified on the loan servicer's Website.

22. To date none of the representatives of the loan servicer have sent me a rejection letter denying the loss mitigation application and explaining that I am ineligible for any loss mitigation relief, and the appeal process has been exhausted or is inapplicable, as required by 12 C.F.R 1024.41(g).

Samuel Pentowski
137 Harriett Drive,
San Antonio, Texas 78216

State of Texas          §
County of Bexar        §

Sworn to and subscribed before me on the 27 day of May 2025, by Samuel Pentowski.

Notary Public, State of Texas
My Commission Expires December 17, 2028

KIMBERLY RODRIGUEZ
My Notary ID # 135205258
Expires December 17, 2028

Page 2 of 2

Copy from re:SearchTX

CAUSE NO. _____

| | | |
|---|---|---|
| **SAMUEL PENTOWSKI,** | § | IN THE DISTRICT COURT OF |
| *Plaintiff(s),* | § | |
| | § | |
| v. | § | |
| | § | **BEXAR** COUNTY, TEXAS |
| **NEWREZ LLC D/B/A SHELLPOINT** | § | |
| **MORTGAGE SERVICING,** | § | |
| *Defendant(s),* | § | _____ JUDICIAL DISTRICT |

### CERTIFICATE OF COMPLIANCE WITH LOCAL RULES REGARDING NOTIFYING OPPOSING COUNSEL

### CERTIFICATE OF CONFERENCE

I, James Minerve, do hereby certify that I am the attorney for the Plaintiff **SAMUEL PENTOWSKI** in the above captioned cause, that Thursday, May 29, 2025 at approximately 12 p.m. I faxed the trustee, Crystal G. Gibson of Mackie Wolf Zientz & Mann, PC, a copy of the pleadings informing the trustee that James Minerve is submitting an emergency ex parte application for a TRO to the Bexar County Presiding District Court Thursday, May 29, 2025, around 2 p.m. and will request the Court to sign the TRO Order ex parte in chambers; I requested that the trustee please call James Minerve with the name and phone number of an attorney who can participate in the TRO hearing in-person, via phone or video conference Thursday, May 29, 2025, around 2 p.m.

The information contained herein is within my knowledge, is true and correct to the best of my knowledge.

/s/ James Minerve

_____
James Minerve
State Bar No. 24008692
13276 N HWY 183
Austin, Texas 78750
(888) 819-1440 (Office)
(210) 336-5867 (Cell)
(888) 230-6397 (Fax)
jgm@minervelaw.com
Attorney for Plaintiff
**SAMUEL PENTOWSKI**

Copy from re:SearchTX

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was sent to the following in accordance with the Texas Rules of Civil Procedure on this 28th day of May 2025:

Trustee:
Crystal G. Gibson
Director of Litigation
Mackie Wolf Zientz & Mann, P.C.
14160 Dallas Parkway, Suite 900
Dallas, TX 75254
Direct: (214) 635-2670
Fax: (214) 635-2686
cgibson@mwzmlaw.com

/s/ James Minerve
_____
JAMES MINERVE

Certificate of Compliance                    Page 2 of 2

Copy from re:SearchTX

# EXHIBIT B-2

DOCUMENT SCANNED AS FILED

## CAUSE NO. 2025CI12086

| | | |
|---|---|---|
| **SAMUEL PENTOWSKI,** | § | IN THE DISTRICT COURT OF |
| *Plaintiff*(s), | § | |
| | § | |
| v. | § | |
| | § | **BEXAR** COUNTY, TEXAS |
| **NEWREZ LLC D/B/A SHELLPOINT** | § | |
| **MORTGAGE SERVICING,** | § | |
| *Defendant(s),* | § | 150th JUDICIAL DISTRICT |

<u>**CONFORMED TEMPORARY EX PARTE RESTRAINING ORDER, ORDER TO POST BOND, AND
ORDER SETTING HEARING FOR TEMPORARY INJUNCTION AND TEMPORARY ORDERS**</u>

5/30/2025                                    I.

On this _____ day of May 2025, SAMUEL PENTOWSKI,, Plaintiff in the above-entitled and -
numbered cause, has filed and on this day presented an Original Motions For Temporary Injunction and
For Ex Partee Temporary Restraining Orders, with relevant and pertinent portions thereof supported with
affidavits, pursuant to Section 5 of Part VI of the Texas Rules of Civil Procedure.

THE COURT, having examined the pleadings, FINDS that it clearly appears from the facts set
forth in the affidavits and pertinent portions of Plaintiff SAMUEL PENTOWSKI, Motions For Temporary
Injunction and For Ex Partee Temporary Restraining Orders that unless the Defendant NEWREZ LLC
D/B/A SHELLPOINT MORTGAGE SERVICING is immediately restrained as Ordered, Adjudged, and
Decreed below in this section `I', that such Defendant will irreparably cause harm to SAMUEL
PENTOWSKI before notice can be given and a hearing is had on Plaintiff' motion for a temporary
injunction; because, the Defendant will foreclose on certain property specified  in section I.

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED that the clerk of this Court
issue a temporary restraining order, in this cause, immediately restraining Defendant, NEWREZ LLC
D/B/A SHELLPOINT MORTGAGE SERVICING from the following acts from the date of signing of this
order until and to the fourteenth day after the signing of this order or until further order of this Court:

1.    The sale scheduled to be held on June 3, 2025, by the trustee, Attorney Michael Schroeder in
        the area of the BEXAR COUNTY Courthouse in San Antonio, Texas, designated by the
        Commissioner's Court pursuant to Section 51.002 of the Texas Property Code as a place where
        the foreclosure sale is to take place of 11002 Funny Cide, San Antonio, TX 78245.

2.    Reposting said property for foreclosure sale or otherwise engaging in any foreclosure
        preparatory activities.

Copy from re:SearchTX

IT IS ORDERED, ADJUDGED, AND DECREED that the foregoing orders shall be binding on Defendant; on Defendant' agents, servants, and employees; and on those persons in active concert or participation with them who receive actual notice of these Orders by personal service or otherwise.

IT IS ORDERED, ADJUDGED, AND DECREED that Plaintiff post a bond of ___$150.00___.

II.

IT IS FURTHER ORDERED that the Clerk shall issue notice to Defendant NEWREZ LLC D/B/A SHELLPOINT MORTGAGE SERVICING to appear and such Defendant is hereby ordered to appear, on ___June 13,2025___, 2025, at ___9:00___ a.m in the Bexar County Civil District Presiding Court, 100 Dolorosa, San Antonio, Texas, 78205. YOU MUST PARTICIPATE IN THE HEARING BY LOGGING ON TO ZOOM OR BY APPEARING IN-PERSON AT THE COURTHOUSE.

TO APPEAR BY ZOOM: At the designated time above, log on to the Presiding Court Zoom using this link: https://zoom.us/my/bexarpresidingcourtzoom. Alternatively, log on to the Presiding Court Zoom using meeting ID is 917-895-6796. If you are unable to log on with a computer or smart device, you can call the Zoom telephone access number for Presiding Court at 1 (346) 248-7799. You will need to input the Presiding Court Zoom access code: 917-895-6796. However, calling in is not recommended by the court.

TO APPEAR IN PERSON: At the designated time above, report in-person to the Presiding District Courtroom (Room 1.09) located at the Bexar County Courthouse, 100 Dolorosa, San Antonio, Texas, 78205. If you appear in person and plan to introduce documents and evidence during your hearing, you must be prepared to share them on Zoom using a personal computer or smart device equipped with a wireless modem or air card and Zoom app or Zoom software installed. Wi-Fi access may not be available at court.

Case assignments will be announced and posted on ZOOM and on You Tube, to show cause, if any, why the following temporary injunctive and other interim relief should not be granted as requested by Plaintiff during the pendency of this cause:

1.  That the preceding temporary restraining orders in sections `I' be made a temporary injunction pending final hearing in this cause;

2.  That the additional orders and temporary injunctions requested by Plaintiff be granted;

3.   That all other orders should be entered or further relief granted respecting the parties as pled for by Plaintiff in Plaintiff' Original Petition in this cause.

Page **2** of **3**

Copy from re:SearchTX

$150.00

UPON THE PLAINTIFF POSTING A BOND OF _____, THE CLERK OF THIS COURT IS DIRECTED TO ISSUE A TEMPORARY RESTRAINING ORDER IN CONFORMITY WITH THE LAW AND THE TERMS OF THIS ORDER.

5/30/2025 2:38:07 pm

SIGNED on May_____, 2025, at    __ :____ o'clock ___.m.

_____
JUDGE PRESIDING

ANTONIA ARTEAGA
DISTRICT JUDGE
57TH DISTRICT COURT

Approved as to Substance and Form

/s/ James Minerve

_____
James Minerve
State Bar No. 24008692
13276 N HWY 183, Ste. 209
Austin, Texas 78750
(888) 819-1440 (Office)
(210) 336-5867 (Mobile)
(888) 230-6397 (Fax)
jgm@minervelaw.com
Attorney for Plaintiff
SAMUEL PENTOWSKI

Page **3** of **3**

Copy from re:SearchTX

# EXHIBIT B-3

FILED
5/30/2025 3:55 PM
Gloria A. Martinez
Bexar County District Clerk
Accepted By: Christina Carreon
Bexar County - 150th District Court

Case 5:25-cv-00663-FB    Document 1-1    Filed 06/12/25    Page 53 of 60



THE MINERVE LAW FIRM                                    Attorneys At Law

13276 N Highway 183, ste. 209    4209 Gateway Dr., Ste. 200    4510 Twin Timber Court
Austin, Texas 78750              Colleyville, Texas 76034       Fresno, Texas 77545
888-819-1440 Office              888-819-1440 Office            888-819-1440 Office
888-230-6397 Fax                 888-230-6397 Fax               888-230-6397 Fax
210-336-5867 Cell                210-336-5867 Cell              210-336-5867 Cell
jgm@minervelaw.com               jgm@minervelaw.com             jgm@minervelaw.com
www.minervelaw.com               www.minervelaw.com             www.minervelaw.com

May 30, 2025

Gloria A. Martinez
Bexar County District Clerk
100 Dolorosa, San Antonio, TX 78205

Re: Cause #:2025CI12086; Request for Unofficial Copy of signed Temporary Restraining Order;
Property Address: 137 Harriett Drive, San Antonio, Texas 78216

To Whom It May Concern:

Please email James Minerve an unofficial copy of the signed Temporary Restraining Order at
jgminerve@aol.com. With this Cover Letter, please find copy fee of $2 for two pages. If you have any
questions, please call me at 210-336-5867.

Very truly yours,

The Minerve Law Firm

By: /S/ JAMES MINERVE
State Bar No. 24008692

1

Copy from re:SearchTX

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **SAMUEL PENTOWSKI,** | § | |
| | § | |
| **Plaintiff(s),** | § | |
| | § | |
| **v.** | § | **Civil Action No.** |
| | § | |
| **NEWREZ LLC D/B/A SHELLPOINT** | § | |
| **MORTGAGE SERVICING** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## DECLARATION OF NICHOLAS M. FRAME

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the following statements are true and correct:

1.     My name is Nicholas M. Frame. I am over the age of 21 years and am fully competent to make this Declaration. All statements of fact made herein are true, correct, and within my personal knowledge.

2.     I am an attorney for Mackie Wolf Zientz & Mann, P.C., attorneys for Defendants Newrez LLC d/b/a Shellpoint Mortgage Servicing ("Defendant").

3.     On June 10, 2025 I searched for the Bexasr County Appraisal District's valuation of the property located at common address 137 Harriett Drive, San Antonio, Texas   (the "Property").  I found the appraisal record for the Property.

4.     I certify the following document attached hereto is a true and correct copy of the original, which I obtained from the Bexar County Appraisal District's website. This document is identified as an exhibit to this Declaration as indicated below:

C-1    Print out from Bexar County Appraisal District's web-site, June 10, 2025

This document is incorporated by reference for all purposes.

      FURTHER DECLARANT SAYETH NOT."

      SIGNED AND DECLARED this June 12, 2025

                                  _____

                                  **NICHOLAS M. FRAME**

# EXHIBIT C-1

## Bexar CAD

### Property Search Results > 449089 PENTOWSKI SAMUEL for Year 2025

Tax Year: | 2025

## Property

### Account

| | | | |
|---|---|---|---|
| Property ID: | 449089 | Legal Description: | NCB 10055 BLK 8 LOT 20 |
| Geographic ID: | 10055-008-0200 | Zoning: | R-5 |
| Type: | Real | Agent Code: | |
| Property Use Code: | 001 | | |
| Property Use Description: | Single Family | | |

### Protest

Protest Status:
Informal Date:
Formal Date:

### Location

| | | | |
|---|---|---|---|
| Address: | 137 HARRIET DR<br>SAN ANTONIO, TX 78216 | Mapsco: | 582E2 |
| Neighborhood: | EAST SHEARER HILLS | Map ID: | |
| Neighborhood CD: | 98007 | E-File Eligible | |

### Owner

| | | | |
|---|---|---|---|
| Name: | PENTOWSKI SAMUEL | Owner ID: | 3358848 |
| Mailing Address: | 137 HARRIET DR<br>SAN ANTONIO, TX 78216 | % Ownership: | 100.0000000000% |
| | | Exemptions: | DV3, HS |

## Values

| | | | Ag / Timber Use Value | |
|---|---|---|---|---|
| (+) Improvement Homesite Value: | + | $629,520 | | |
| (+) Improvement Non-Homesite Value: | + | $0 | | |
| (+) Land Homesite Value: | + | $72,150 | | |
| (+) Land Non-Homesite Value: | + | $0 | | |
| (+) Agricultural Market Valuation: | + | $0 | | $0 |
| (+) Timber Market Valuation: | + | $0 | | $0 |
| | | ------------------------- | | |
| (=) Market Value: | = | $701,670 | | |
| (–) Ag or Timber Use Value Reduction: | – | $0 | | |
| | | ------------------------- | | |
| (=) Appraised Value: | = | $701,670 | | |
| (–) HS Cap: | – | $0 | | |
| | | ------------------------- | | |
| (=) Assessed Value: | = | $701,670 | | |

## Taxing Jurisdiction

Owner:             PENTOWSKI SAMUEL
% Ownership:  100.0000000000%
Total Value:     $701,670

| Entity | Description | Tax Rate | Appraised Value | Taxable Value | Estimated Tax | |
|--------|-------------|----------|-----------------|---------------|---------------|--|
| 06 | BEXAR CO RD & FLOOD | 0.023668 | $701,670 | $548,336 | $129.78 | |
| 08 | SA RIVER AUTH | 0.017870 | $701,670 | $663,603 | $118.59 | |
| 09 | ALAMO COM COLLEGE | 0.149150 | $701,670 | $684,653 | $1,021.16 | |
| 10 | UNIVERSITY HEALTH | 0.276235 | $701,670 | $551,336 | $1,522.98 | |
| 11 | BEXAR COUNTY | 0.276331 | $701,670 | $551,336 | $1,523.51 | |
| 21 | CITY OF SAN ANTONIO | 0.541590 | $701,670 | $551,336 | $2,985.99 | |
| 55 | NORTH EAST ISD | 1.000700 | $701,670 | $591,670 | $5,920.84 | |
| CAD | BEXAR APPRAISAL DISTRICT | 0.000000 | $701,670 | $691,670 | $0.00 | |
| | Total Tax Rate: | 2.285544 | | | | |
| | | | | Taxes w/Current Exemptions: | $13,222.85 | |
| | | | | Taxes w/o Exemptions: | $16,036.98 | |

## Improvement / Building

**Improvement #1:** Residential  **State Code:** A1  **Living Area:** 3080.0 sqft  **Value:** $628,150

| Type | Description | Class CD | Exterior Wall | Year Built | SQFT |
|------|-------------|----------|---------------|------------|------|
| LA | Living Area | G - SB | | 1951 | 1661.0 |
| AG | Attached Garage | G - SB | | 1951 | 396.0 |
| OP | Attached Open Porch | G - NO | | 1951 | 25.0 |
| LA1 | Additional Living Area | G - SB | | 2020 | 240.0 |
| LA2 | Living Area 2nd Level | G - SB | | 2020 | 1179.0 |
| OP2 | Attached 2nd story porch | G - NO | | 2020 | 48.0 |

**Improvement #2:** Residential  **State Code:** A1  **Living Area:** sqft  **Value:** $1,370

| Type | Description | Class CD | Exterior Wall | Year Built | SQFT |
|------|-------------|----------|---------------|------------|------|
| RSH | Shed | F - NO | | 0 | 144.0 |

## Land

| # | Type | Description | Acres | Sqft | Eff Front | Eff Depth | Market Value | Prod. Value |
|---|------|-------------|-------|------|-----------|-----------|--------------|-------------|
| 1 | RES | R/1 Family not Farm Single | 0.3444 | 15000.00 | 0.00 | 0.00 | $72,150 | $0 |

## Roll Value History

| Year | Improvements | Land Market | Ag Valuation | Appraised | HS Cap | Assessed |
|------|--------------|-------------|--------------|-----------|--------|----------|
| 2025 | $629,520 | $72,150 | 0 | 701,670 | $0 | $701,670 |
| 2024 | $655,020 | $72,150 | 0 | 727,170 | $0 | $727,170 |
| 2023 | $669,600 | $72,150 | 0 | 741,750 | $0 | $741,750 |
| 2022 | $562,950 | $65,700 | 0 | 628,650 | $13,471 | $615,179 |

| 2021 | $232,140 | $57,150 | 0 | 289,290 | $0 | $289,290 |

## Deed History - (Last 3 Deed Transactions)

| # | Deed Date | Type | Description | Grantor | Grantee | Volume | Page | Deed Number |
|---|-----------|------|-------------|---------|---------|--------|------|-------------|
| 1 | 6/14/2022 | CD | Correction Deed | | PENTOWSKI SAMUEL | | | 20220149653 |
| 2 | 2/11/2022 | WD | Warranty Deed | | PENTOWSKI SAMUEL | | | 20220040748 |
| 3 | 8/22/2019 | GWD | General Warranty Deed | DELAFUENTE DANIEL & VANESSA | | | | 20190168247 |

**2025 data current as of Jun 10 2025 2:35AM.**

**2024 and prior year data current as of Jun 5 2025 7:10AM**

**For property information, contact (210) 242-2432 or (210) 224-8511 or email.**

**For website information, contact (210) 242-2500.**